Good afternoon, Your Honor. May it please the Court, I'm Michael McCready on behalf of Petitioner Inez Gutierrez. You had two issues before you. One is causal connection, the other one is penalties. They got before you in completely different avenues. I need to take you back to Arbitrator Cronin. He had a hearing. There were eight fact witnesses, five doctor depositions. He rendered an opinion which found there was an accident, there was notice, there was causal connection, there was prospective medical care, and there were to the Commission who affirmed Arbitrator's opinion but reversed it on the penalties. The Respondent takes it to Circuit Court on the causal connection, and we also went to the Circuit Court on the penalties issue. So you've got two separate issues before the Circuit Court, one taken up by the Respondent, one by the Petitioner. The Circuit Court basically reverses the Commission on causal connection and affirms their decision on the lack of penalties. So Inez Gutierrez is the appellant on both of the issues before you, but they got to you on different avenues with different standards of review. I'm going to start with the causal connection. This was very, very fact specific. There were eight factual witnesses called about how the accident happened, if the accident happened, how it happened, and then five doctor depositions. And the crux of the Respondent's argument on causal connection was, well, we impeached the Petitioner about how it happened. It didn't happen quite the way that she said. She said that it hit her in the low back. We showed that it couldn't have hit her low back. It had to be the upper back. And therefore, doctors, your opinions on causal connection are no good. Well, notice this is a factual issue. The causal connection is an opinion, and the opinion is all based on what facts are presented to the opinion witness, to the medical doctors. A medical doctor can base his opinion on a lot of things. If there are facts that are not known to a medical doctor, that's room for cross-examination. Doctor, did you know, or would it change your opinion if X? Would it change your opinion if Y? Now... So you're saying, I mean, the Commission can believe her version over somebody else's, right? Well, that's correct. I mean, we shouldn't be here arguing about facts, about how it happened. Arbitrator Cronin listened to all the witnesses, and in his opinion, which was affirmed by the Commission, they found that there was an accident, that there was notice, that there was a causal connection. All of these after listening to all the witnesses that were testifying. Now, the causal connection needs to be based on medical testimony. We have five medical doctor depositions in this case. Four of them were treaters, and one of them was the Respondent's expert. All of them found that the November 2010 accident was the cause of the injury, and was the cause to require the plaintiff to need a back fusion. And Arbitrator Cronin and the Commission, that's what their finding was. The circuit court reversed that. Now, the circuit court on the causal connection issue has to review it for manifest weight of evidence, and she basically said, the circuit court judge, that there is no causal connection. I'm going to reverse the Commission. However, in her opinion, on page 4, she says, the Commission's findings regarding causation hinged upon a small fraction of the evidence in the record, and relied on large part on Defendant Gutierrez's credibility. Well, guess what? That's enough. Okay? In her own words, in her opinion, that's manifest weight of evidence. And credibility determination is up to the Commission, not the circuit court. By using a small amount of evidence, and not all of it demonstrably reliable, the Commission ignored a significant portion of the record in making his determination. Well, that's what the Commission does. They make these factual determinations. It's not up to the circuit court judge to reweigh the evidence. It's the circuit court's standard of review's manifest weight of evidence. And in her own words, I'm sure she wasn't giving this to us as an issue to appeal, but in her own words, it does seem that she agrees that at least it meets the manifest weight of evidence. She might not agree with it. You know, she might not agree with what Gutierrez said. She might not agree with what the doctors had said. But it certainly meets that standard. And so we're here appealing that issue, and we believe that the Commission's opinion should be reinstated, or the circuit court to be reversed. Counsel, let me ask you about this cart that was brought in at arbitration. And I haven't been able to really identify what occurred at arbitration. Was there a stipulation of some sort that this exemplar court was the same type, same height as the cart that was involved in the incident? How did that play out? Did the employer just bring a cart in and it was there? I mean, what is in the record in terms of evidence as to the height of this cart, for example? There was sufficient foundation. They brought the cart itself. It wouldn't even fit in the arbitrator's room. But they brought it up the elevators for the arbitrator to look at. Well, when you say the cart itself, I mean, you say in your brief that it was not the actual cart. All the witnesses testified that it was similar or it wasn't the exact cart, but the same style, same type. We really didn't dispute whether it was the actual cart. Okay. And we had no dispute. So for purposes of the appeal here, what was presented in the way of this exemplar cart at the arbitration was one of probably comparable height as the one that was involved in the incident. That's correct. But based on the argument in your reply brief, what's missing in the record is any medical testimony that would indicate that this injury could not have happened, even assuming that it was a cart that was of such a height that it would have hit your client in the upper back, in the shoulder area, could it still have caused this injury or could it not have? Yeah. I believe that, particularly with Dr. Yacour, on cross-examination, respondents said, well, what if it hit her in the back? And he said, that doesn't make a difference to my opinions. Once again, a factual dispute can be the basis of But it doesn't mean that the opinion is completely invalid. So respondent asked the doctors at different times, well, are you aware that it hit her in the upper back? Now, that's assuming that they proved that it hit her in the upper back. But, doctor, would that change your opinion? Well, no, it really wouldn't because of the fact she had an accepted injury that happened in December of 09 that she was continuing to treat with. She continued to have epidural injections right up until the November 2010 data loss, which we're arguing about today. And the fact that she had a preexisting herniated disc from the first accepted date of loss makes her more susceptible and prone towards aggravation. All the doctors have said that this second date of loss, the one that they're contesting, aggravated and objectively changed things because there's an MRI from after the first date of loss, then there's an MRI, there's a second date of loss, and a second MRI. And those MRIs are different. And that's really important because their expert reviewed both of those MRIs and said, this second MRI from the second date of loss tells me that something else changed from the first date of loss to the second date of loss. And me, the Respondent's IME, I believe that the second date of loss is causally connected to her current state of health. Okay? Now, once again, they're talking about a factual issue here about where it hit her on the back, and that's perfect fodder for cross-examination, but it doesn't mean all the doctors' opinions go out the door. And the Commission, you know, weighed the factual testimony, reviewed the medical testimony and the basis for the medical opinions, and they found causal connection. So the circuit court basically re-weighed all of that. Well, I disagree with the factual conclusions that the Commission made with regards to where it hit her on the back and the credibility of Gutierrez. And if I accept the Respondent's factual assertions, then I think that the circuit court speaking, the circuit court saying, then the medical opinions aren't valid. Well, that doesn't mean they're not valid. It can attack the basis for those opinions, but it doesn't mean that the opinions are completely out the door. In the civil context, it goes to the weight, not the admissibility. So the factual issues which were resolved by the arbitrators would go towards the weight to be given the medical evidence, not the admissibility. And the circuit court's opinion basically throws all the medical opinion testimony out the door. Now, there were four treater depositions and one Respondent I.M.E., and all of them found causal connection. And the reason why we filed for penalties was this. Two dates of loss. The first date of loss was accepted. She treated, the first date of loss was December 19, 2008. She continues with conservative treatment, and in August of 2009, they send her for an I.M.E. I.M.E. says maximum medical improvement, no more treatment authorized, no more T.T.D., so the first date of loss, according to the Respondent, is done, December 19, 2008 to August 24, 2009. That I.M.E. says all the treatment up to August 24, 2009 is medically necessary and related to the first date of loss. We have never been able to get those medical bills paid, even though their I.M.E. said that it was related. Okay? We come up to the second date of loss, which is three months later, November 5, 2009. She has the second date of loss. She continues to treat for the second date of loss. They send her back to the same I.M.E. doctor, and that I.M.E. doctor says the second date of loss is the cause for the need for surgery. That second date of loss, there's something different here. The MRI is different. I believe the second date of loss is the need for the surgery, and it's causally related. So we file a petition for penalties on both. We've got our treating doctor saying that she needs surgery. We've got their I.M.E. saying she needs surgery, and it's related to the second date of loss. Arbitrator Cronin... When did you file that petition? What was the date? We filed the petition on, I believe it was August 2011. It was approximately one year after their first I.M.E. Well, did you get a letter on November 18, 2010, from the respondents saying give us the unpaid bills? Yes. And we'll pay them? Yes. When did you get them the bills? We sent them bills on several occasions. You sent them $97,000 worth of bills, according to them, and only 19,134 of them actually remained outstanding. No, I don't think that's correct. According to their attorney that they called as a witness, there was a difference of about 19,000. Yes. So there was they, their attorney testified that the bills that we had submitted, we submitted 19,000 more, and the reason was is because some of the bills we submitted were either paid by workers' comp or paid by Blue Cross Blue Shield. When were they paid by? Pardon? When were the remaining bills paid by? What date? They weren't. Based on the procedural posture of this case, these bills are still unpaid. Okay? So we send all the bills to the respondent. In the meantime... My understanding of this record is their contention is they paid all of the outstanding bills that you sent them on November the 10th, and that they were paid by the completion of Mr. Fernandez's investigation in January of 2011, and that there's no evidence in the record to establish that you ever submitted any additional unpaid bills to them after that date. No, I don't think that's correct. Arbitrator Cronin specifically... I don't care about Arbitrator Cronin. I want to know what's in the record. According to Attorney Fernandez, who a respondent called, on the record, at C447, the bills that we submitted, and this is as of 12-9-2010, 19,000 was paid, but the remainder remained open and unpaid. The problem that we have with the penalties is this, is that... I think his testimony, according to my records, was only 19,134 remained outstanding. You gave him $19,000 worth of bills, and he testified that only $19,134 worth remained outstanding. And then he testified they all got paid by January the 7th, 2011, when he completed his investigation. One of us is mixed up on what's in that record. In order, the arbitrator's opinion, I mean, they would be entitled to... I don't care what the arbitrator's opinion says. I want to know what's in the record, because I'm reviewing the commission's decision. I don't care about the arbitrator. I care about the commission. The commission turned around and said, we're not giving you the medical bills because, number one, you didn't submit them timely, and then when you did submit them, they paid them. So now the question is, is that true? And if that's true, the commission didn't err. If I have a misreading and they failed to pay the remainder of $97,000 worth of bills until August, maybe you've got a point. Well, the... In order... They were claiming an H.A. credit, okay, that Blue Cross had paid them. In Exhibit B of the arbitrator's opinion, which was adopted by the commission, it shows what bills were paid and what was outstanding as of the date of the close of proofs. And the close of proofs was when? The close of proofs was, I believe, in March of 2011. It was after the December 10th hearing. But they say that you never sent them any bills after the transmittal of this $97,000 worth of bills that they paid in January of 11th. And my notes indicate the evidence in the record establishes the claimant submitted unpaid bills before the current counsel before Fernandez acknowledged receiving them after his... He didn't... There's no evidence in the record you ever sent any bills after Fernandez acknowledged receiving the 2010 November letter. And you can't expect them to pay them if you don't send them to them. Well, we sent them numerous times, including to their Respondent's prior attorney. When's the last time you sent bills to them? Counsel, your time is up. Okay. But I think you should make note of that question, Justice Hoffman's question. Great. You'll have time in reply to answer it. Yes. Thank you, Your Honor. Counsel? Let's start backwards and straighten out this bill issue first. Sure. I think Mr. McCready is doing the best he can with what he has. I think... Don't editorialize it. Tell me what's in this record. Did you submit bills? Did you get bills in November of 2011? And were there $97,000 worth of bills and only 19,000 of them were outstanding? What happened was there was an accepted accident and a disputed accident. There was also a change in law firms representing the Respondent, Carl Buddig. Our firm picked up the bill. It was sometime after the first IME. The medical bills were never transmitted to us. And we made that clear to opposing counsel and Correspondents that it is part of the record. And what was the date of that, Correspondents? The date? We sent a letter on January 28th. Oh, no, wait. November 24th, 2009, asking for medical bills. We sent, there was a letter sent on May 4th, 2010, saying that we would pay the medical bills up to the first IME. On August 6th, 2010, which was right before the first trial date was supposed to happen, opposing counsel sent us a big stack of medical bills, but they were commingled. It was for the first accident and for the second accident. And a large portion of the medical bills were already paid, both by comp and by group insurance. At the time, I was just an associate, and so it was given to me as a task to investigate. So you're Mr. Fernandez? I am Mr. Fernandez, yes. Okay. And my task was to investigate what of these medical bills were paid, because opposing counsel was not sending to us updated or separated medical records. Did you send them a letter on November 18th, 2010? I believe so, yes. What did that letter say? I don't have it in front of me. According to the record, it requested that they submit unpaid medical bills from the date of the initial injury to the date of the second injury. And then you testified, according to my records, that you received numerous medical bills and that you spent days investigating and contacting service providers to determine the actual amount that was outstanding. And then my understanding of your testimony is that only 19,000 of bills totaling $97,000 were actually outstanding. Is that accurate? No, that is not accurate. What's accurate? There was at least a $19,000 discrepancy between the amount that opposing counsel sent us, which I believe was a hundred and something thousand dollars he said was due and owing. But we found that we guesstimated that 97,000 was perhaps due and owing. And we did not mandate records from all of them, because they actually, there were a significant portion of them who said that opposing counsel needed to request the records on behalf of his client and that we couldn't get that information. We requested this several times of opposing counsel. He did not furnish us the medical bills. The first time that we got medical bills that were due was before the proofs were closed. And it should be noted, I did not bring proof of payment, but these medical bills have been satisfied. They were satisfied for the first accident following receipt of these bills. Regarding causal connection, if I may jump to that, opposing counsel is trying to have it both ways, so to speak. And in so doing, he presents an inherently conflicting argument. He says that there was an aggravation to her preexisting condition, which is undisputed. But then when we get to the portion where we say, okay, what aggravated that preexisting condition, he relies on Dr. Yipor who says nonsensically it doesn't matter because she had a preexisting condition. In our opinion, it skirts the issue. It circumvents the issue, which is what was that mechanism that was a cause. And so contrary to what opposing counsel argues here, this is not about the facts. It's about the burden of proof. And opposing counsel doesn't, does all he have is Yipor? Doesn't Dr. Deesfield and Succi support the claimant's case? Yes. Every single doctor gives an opinion on causation. But what Respondent did is doctor by doctor went through their testimony, and the record supports this, and I cited to every single one, it shows that all of the doctor's testimony is based on the flawed premise that she was hit in the lower back. She tells every single How is that a flawed premise? They are relying on her account of what happened in formulating their opinion. Yes. Is there something wrong with that? If she says I was hit in the shoulder, if I was hit in the shoulders, which was the truth, if it happened, then they would have a sound factual basis to render their opinion. But their opinion, their conclusion of what caused this problem to worsen is based on a lie. All of the doctors, not a single doctor knew what happened to the petitioner. Well, did Dr. Yipor indicate that the location of the hit on her back was irrelevant? He did say that. The only way that Respondent can actually reconcile that is that in Dr. Yipor's role as her treater, it truly doesn't matter. His job is to treat the petitioner and not to assess how the petitioner got hurt or, you know, try to reconstruct the accident. Well, regardless of his role, isn't there evidence in the record in the form of Dr. Yipor's testimony that the location of the hit on her back was irrelevant because the petitioner had a preexisting herniated disc in her low back on the date of the second accident and the accident aggravated the condition? Isn't that the evidence that the commission could rely on? That is the evidence that the commission did rely on. And the reason that we're here today and the reason that the circuit court ruled the way it did was that that doesn't make any sense. It just ‑‑ it's inherently ‑‑ What doesn't make sense about it, for one thing? Let's just go there for a minute. What doesn't make sense? What doesn't make sense is that you can't have something that causes a condition of ill being but then say that something is irrelevant. There has to be some form of something to aggravate her condition. When you consider what happened to the petitioner, it was clear that on August of 2009 she was at MMI. Her MRI, which the commission completely ignores, shows a very minimal bulging disc. Now, fast forward to 2012 where there's a very significant disc protrusion and she actually does need to have treatment for this. Clearly something happened. And Respondent doesn't dispute that something happened, but you can't say that something happened but then ignore what that something was. What did the claimant testify to? The claimant testified that she was struck in the lower back. Yeah? By a garbage cart. Okay. But it's physically impossible for the garbage cart to have struck her in the lower back. Well, isn't what the doctor said, though, that even the mechanism of injury, when he said it's irrelevant, even if she was struck in the shoulder, it still could have aggravated her preexisting condition? In other words, it's not impossible that she was struck in the shoulder, as you say, and it still aggravated her preexisting condition. If her condition And that's the issue, isn't it, whether or not the accident, wherever she was struck, is a cause in accelerating or aggravating her preexisting condition. If her condition is so fragile that being, you know, hit in the shoulder with this garbage cart were to aggravate her lower back, I mean, you know, what activity of daily living would not, you know, make it dangerous for her, you know, walking around could aggravate her lower back. Did anybody say, did any doctor say what you're just now saying? Every single doctor said that if she was not struck in the lower back, as she was, her opinion on causation would be changed. Every single doctor? Every single doctor that we deposed, yes. Dr. Yipor? That is specifically, except for Dr. Yipor. There we go. That is cited, too, in our brief. Let me make this observation. If the injury was a contusion or a laceration, the location of where the cart hit would be, I would say, particularly relevant. There would be some sort of forensic quality to it, because it would indicate how that cart lined up with the claimant's body. But here we're talking about an injury to the disc, disc located within vertebrae, vertebrae that are interconnected. So now you're getting into a very complicated mechanism of injury in a very complicated portion of the body. So, you know, it's not as clear cut, I think, as you would want it to be here. And you do have evidence in the record, via Dr. Yipor's testimony, that it doesn't matter what part of the back was hit, it still could aggravate the condition. That argument cuts both ways, though. Because, you know, if you have a complicated injury like that, and the petitioner doesn't give any proof, any proof to a reasonable degree of medical certainty that this was a cause, then you don't have any opinions to rely on. There is no case. There is no causation. And what the circuit court recognized is that when you look at the record, when you look at all of the evidence, the petitioner failed to present any credible evidence. Instead, the respondent, piece by piece, person by person, took apart all of the testimony and showed that there was no reasonable degree of medical certainty. It was all based on a guess. Even Dr. Yipor's was based on a guess. And the respondent would further argue that Dr. Yipor, who was asked only about a causation at his deposition, violated the 48-hour rule in giving a reasonable causation opinion that was not disclosed in any of his reports. Counsel, your time is up. Thank you. Counsel, you may reply. Yes. The date of last transmittal of the records and the bills was on March 10th of 2011. That's when they were introduced at the proofs, the closing of the proofs. The list of those bills and the dates and the providers are attached to the arbitrator's case. But that doesn't assist us in determining whether they were submitted to the respondent timely. I was anticipating that question. On December 9th, 2010, we sent records and bills. That's at record C447. And he claims he had to spend weeks figuring out which ones were attributable to which accident. There are tens of thousands of workers' compensation cases filed every year and bills get paid for the ones that are accepted. This first date of loss was accepted. The bills, as of the date of the hearing, March 10th of 2011, over two years after this date of loss, even we have the letter from their respondent's attorney saying we will pay them. They're still not paid. Wait a minute. We will pay them if you send them? Right. And that letter. And when did you send them? That letter sent from prior counsel was May 4th of 2010. So when did you send prior counsel all these bills? We sent them on June 30th, 2010. That's at record C1722. We said here are the records and bills. Please pay them. This is after their IME says the first date of loss is reasonable and necessary. Okay. We sent them. I'm sorry. And when did they switch attorneys? They switched attorneys in approximately August of 2010. It couldn't be August because Mr. Fernandez, I think, was it November he sent you a letter? Maybe it was August. Go ahead. We also transmitted a letter on August 6th of 2010 at C1723. On November 18th, 2010, the new attorney said give us the records and bills. We will pay them. Now, this is three months after our 19B has already started. Okay. Our 19B starts in August of 2010, and in November of 2010, their new lawyers are once again asking for records and bills, which we had submitted at the start of the 19B. Which was two months earlier? Which is two, two-and-a-half months earlier. This is an earth-shattering period of time, you know. We sent them again on December 9th of 2010, and the last transmittal was March 10th of 2011. Now, the reason I wanted to touch on the arbitrator's opinion is because he found in Exhibit B of his opinion which bills were reasonably transmitted, which they should have paid. And it's in there. It shows what the full bill was, what the amount paid, and by whom, and what amount was outstanding. That's part of his decision. But the commission found that the bills were not transmitted in a timely fashion, and that because of the change of attorneys, they would not assume that this was either vexatious or without reason, and reversed it. So we're not determining what the arbitrator did here. Right. We're determining what the commission did. I agree with that. And the commission did it in a very, very trite sentence. They turned around and they merely said, get it out for you. The commission finds that the petitioner has not entitled any penalties or returning fees for the nonpayment of medical bills. It finds that Respondent's failure to pay was not unreasonable or vexatious. The bills were not transmitted in a timely manner. Now, the question becomes, I suppose, when you've transmitted these bills to the prior attorney  When was that? May of 2010. May of 2010. How old were those bills? The date of loss was December of 2009, and their IME was August of, I'm sorry, I'm missing, I'm out by a year. Their, December of 2008, and their IME was August of 2009. So from August 2009 to May of 2010 is when the attorney said, give us the bills and we will pay them. Yeah, but don't you think the burden is on the petitioner to submit the bills he wants to be paid as opposed to requiring the Respondent to go look for them? Well, the providers, the providers are typically the ones that bill workers' compensation. When there's an issue about, about compensability, you know, then the attorney might get involved. But they stipulated, this is a compensable accident. Well, they stipulate it's a compensable accident, but for a period of almost two years after the incident, nobody sends them any bills to pay. And so you're going to fault them for not paying them? Well, at a certain point, I mean, how many times does a petitioner have to submit the bills? I mean, when does they? Well, I mean, if the petitioner had submitted them two years earlier or submitted them as they got, as the petitioner got the bills from the providers, I don't think the Commissioner would have said what it said. And that's not in the record. That's not in the record. So. Well, we've got to find out if this is an abuse of discretion. Correct. That's a worse burden than manifest weight. Correct. So. But I want to look at the record as to what Mr. Fernandez's testimony actually was. But go ahead. Is there anything further? Nothing further? Okay. Thank you. Very good. Thank you, Counsel Bull, for your arguments. This matter will be taken under advisement and a written disposition will issue.